## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**GENEIVA JONES**                                          CIVIL ACTION

**VERSUS**                                                      No. 22-1522

**EVONIK CORPORATION, ET AL.**                    SECTION I

### ORDER & REASONS

Before the Court is defendant Shell Oil Company's ("Shell") Rule 12(b)(6) motion[1] to dismiss. Also before the Court is defendant Evonik Corporation's ("Evonik") Rule 12(b)(6) motion[2] to dismiss or, alternatively, Rule 12(e) motion for a more definite statement. Plaintiff Geneiva Jones ("plaintiff") opposes[3] both motions. For the reasons that follow, the Court will deny both motions.

## I. BACKGROUND

### A. Procedural History

This case arises out of alleged exposure to ethylene oxide ("EtO") near a petrochemical plant in Reserve, Louisiana (the "Facility"), owned and operated by Evonik and Shell.[4] Shell owned and operated the Facility from 1991 until 1999,[5] and Evonik has owned and operated the Facility since that time.[6]

---

[1] R. Doc. No. 4 (motion); R. Doc. No. 11 (reply).

[2] R. Doc. No. 12 (motion); R. Doc. No. 17 (reply).

[3] R. Doc. Nos. 8, 14.

[4] R. Doc. No. 2, at 1 ¶ 1.

[5] *Id.* at 4 ¶ 16.

[6] *Id.* at 4 ¶ 17.

On April 26, 2021, fourteen plaintiffs filed an action in the Civil District Court for St. John the Baptist Parish, alleging that inhalation of EtO emitted from the Facility was a substantial factor in causing plaintiffs' cancer, or their spouses' cancer.[7] On June 4, 2021, Evonik removed the case to federal court, contending that the Court has diversity jurisdiction under 28 U.S.C. § 1332.[8] The action was allotted to Section R.

On May 27, 2022, Judge Vance issued an Order and Reasons granting Shell's motion to dismiss in its entirety, on the grounds of prescription and the non-applicability of *contra non valentem*. *Ellis v. Evonik Corp.*, No. 21-1089, --- F. Supp. 3d ---, 2022 WL 1719196, at *8 (E.D. La. May 27, 2022) (Vance, J.). Judge Vance dismissed these claims as to Shell without prejudice, and she granted plaintiffs leave to amend their complaint to plead facts, specific to each plaintiff, to support the application of *contra non valentem* after their dates of diagnoses. *Id.* Judge Vance also granted in part and denied in part Evonik's motion to dismiss. Specifically, Judge Vance dismissed plaintiff's battery claims with prejudice. *Id.* at *16. Judge Vance denied the motion with respect to plaintiffs' continuing-tort claims under Louisiana's vicinage articles. *Id.* Judge Vance dismissed plaintiffs' negligence claim without prejudice, granting plaintiffs leave to amend as to that claim. *Id.*

Finally, Judge Vance, noting the significant factual variations between plaintiffs as to the nature and duration of their exposure and their types of cancer,

---

[7] R. Doc. No. 1-2.

[8] *Id.*

concluded that a severance was warranted. *Id.* at *14. Plaintiff Jones' action was allotted to Section I, and plaintiff thereafter filed her amended complaint.[9]

## B. Factual Background

The facts, as alleged in plaintiff's amended complaint, are as follows. EtO is an odorless, colorless gas used to make a range of products, including antifreeze, textiles, plastics, detergents and adhesives.[10] EtO is one of 187 pollutants that EPA has classified as "hazardous air pollutants" or "air toxics."[11] "Scientific and industry studies show that long-term exposure to EtO increases the risk of cancers of the white blood cells[ ] including, but not limited to, non-Hodgkin lymphoma, myeloma, lymphocytic leukemia, and breast cancer."[12] The World Health Organization and various federal agencies have classified EtO as a carcinogen.[13]

The Facility has emitted large volumes of EtO gas for several decades.[14] The EtO emitted by the Facility remains in the air for months, becomes concentrated in atmospheric inversions, and moves through neighboring communities through prevailing winds.[15] Because its half-life in the atmosphere is 211 days, EtO remains in the air near the Facility long after it has been emitted.[16]

---

[9] R. Doc. No. 2.

[10] R. Doc. No. 2, at 4 ¶ 18, 5 ¶ 20.

[11] *Id.* at 5 ¶ 21.

[12] *Id.* at 5 ¶ 22.

[13] *Id.* at 6 ¶¶ 26–35.

[14] *Id.* at 2 ¶ 36.

[15] *Id.* at 2 ¶ 37.

[16] *Id.*

The Facility releases state-authorized amounts of EtO into the atmosphere, which are nevertheless dangerous to persons working and living near the Facility, as set forth in greater detail below.[17] The Facility also releases unauthorized amounts of EtO into the air and water.[18] Such unauthorized releases are called "fugitive releases," and they are caused by undetected and unrepaired leaks and faulty equipment, among other things.[19] Fugitive EtO emissions from the Facility have dramatically increased the volume of EtO in the atmosphere around the Facility and in the surrounding community, "including just by way of example, multiple unauthorized releases of EtO in 2012 and 2013 that may have led to as much as 1950 lbs. of EtO being released into the atmosphere according to the facility, which is approximately the same amount of planned emissions that were released those years such that the fugitive emissions doubled the amount of EtO in the air."[20]

In August 2018, the  Environmental Protection Agency ("EPA") released the results of the 2014 National Air Toxics Assessment ("2014 NATA").[21] The 2014 NATA estimated concentrations of airborne toxins and population exposure, and it calculated the associated risks of cancer and other serious health problems.[22] The assessment revealed that individuals living in census tracts around the Facility,

---

[17] *Id.* at 2 ¶ 40.

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] R. Doc. No. 1-2, at 9.

[22] R. Doc. No. 1-2, at 9.

including plaintiff, have some of the highest risks of cancer from EtO exposure in the country.[23]

The 2014 NATA results were not communicated to any lay persons and the citizens of St. John the Baptist Parish.[24] The EPA Office of Inspector General ("OIG") issued a management alert in March 2020 that called on the EPA and state and local officials to provide information about EtO to impacted residents who faced increased and "unacceptable" risks of cancer from certain facilities' EtO emissions, specifically including the Evonik Facility.[25] The 2020 OIG alert called on the EPA to conduct risk assessments of the identified facilities, including Evonik's, and to develop new emissions standards for facilities emitting EtO that are creating unreasonable risks for surrounding communities.[26] The EPA's assessment confirmed that individuals living near the Evonik Facility have a risk of developing cancer that is eight times what the EPA considers to be "acceptable."[27]

Despite the OIG's 2020 alert, there was no public awareness initiative or campaign by the defendants or any government agency to educate the community until 2021, when the first public outreach meeting was organized by the EPA to inform local residents they face an increased risk of developing cancer from Evonik's EtO emissions.[28] At that meeting, the EPA explained that, notwithstanding the fact

---

[23] *Id.*

[24] R. Doc. No. 2, at 8 ¶ 41.

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] *Id.*

that Evonik has decreased its EtO emissions from 2014 to 2020 by nearly 50%, the levels emitted were still not "sufficiently protective of human health" according to EPA guidelines and standards, even though they were within permitted limits, pursuant to state law.[29]

With respect to Evonik's claimed reduction in levels of EtO emissions from 2014 to 2020, the decrease in EtO emitted into the ambient air was mostly attributable to the Facility reducing "fugitive" EtO emissions, i.e., unplanned emissions caused by leaks in equipment, faulty processes, and accidents.[30] According to the EPA, Evonik was able to reduce unplanned fugitive emissions by 92% from 2014 to 2020, mostly as a result of improvements to the Facility's mandated leak detection and repair program ("LDAR").[31]

Plaintiff has lived within a mile of the Facility for 48 years.[32] She is 70 years old, and she was diagnosed with breast cancer in 2016.[33] She further alleges:

> No physician ever advised Plaintiff that Plaintiff's cancer may have been caused by exposure to EtO . . . . Plaintiff did not know anything about EtO to ask the physicians any questions about her exposure, which was also unknown to her at the time, and cancer. Plaintiff did not know that Plaintiff was exposed to dangerous amounts of EtO since it is colorless and odorless and Defendants have never advised the general public of the dangers of EtO. Plaintiff also had no knowledge of the operation of the Facility at any time, did not know that it emitted EtO, and did not know that the emissions of EtO were subject to regulation and the subject of scientific studies. Plaintiff has never had any education related to chemistry beyond high school studies. Plaintiff did not know

---

[29] *Id.* at 9 ¶ 43.

[30] *Id.* at 9 ¶ 44.

[31] *Id.*

[32] R. Doc. No. 2, at 3 ¶ 10, 12 ¶ 54.

[33] R. Doc. No. 2, at 3 ¶ 10.

how to research information related to operation of the Facility. The first time Plaintiff had any reason to think that EtO emission from the Facility was a substantial factor in causing Plaintiff's cancer was when Plaintiff received an advertisement in the mail from The Voorhies Law Firm on or after April 28, 2020 . . . . The receipt of the advertisement was the first time Plaintiff ever knew of the existence of EtO . . . . Thereafter Plaintiff took reasonable steps to investigate whether exposure to EtO had caused Plaintiff's cancer or created a risk of future health problems. Plaintiff filed this action within one year of learning facts supporting that she had a cause of action against Defendants.[34]

## II.  STANDARD OF LAW

Pursuant to Rule 12(b)(6), a district court may dismiss a complaint or part of a complaint when a plaintiff fails to set forth well-pleaded factual allegations that "raise a right to relief above the speculative level." *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 555 (2007); *see Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007). The complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 570). If the well-pleaded factual allegations "do not permit the court to infer more than the mere possibility of misconduct," then "the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. Proc. 8(a)(2)) (alteration in original).

---

[34] R. Doc. No. 2, at 12 ¶ 54.

In assessing the complaint, a court must accept all well-pleaded facts as true and construe all factual allegations in the light most favorable to the plaintiff. *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999); *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010). "[T]he Court must typically limit itself to the contents of the pleadings, including attachments thereto." *Admins. of the Tulane Educ. Fund v. Biomeasure, Inc.*, No. 08-5096, 2011 WL 4352299, at *3 (E.D. La. Sept. 16, 2011) (Vance, J.) (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000)). In assessing a complaint, courts "do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005) (citing *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004)). The complaint "must provide the defendant with fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (internal quotations omitted). "Dismissal is appropriate when the complaint 'on its face show[s] a bar to relief.'" *Cutrer v. McMillan*, 308 F. App'x 819, 820 (5th Cir. 2009) (quoting *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986) (alteration in original)).

Federal Rule of Civil Procedure 12(e) states, in pertinent part, that "[a] party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." The motion must be made prior to filing a responsive pleading and "must point out the defects complained of and the details desired." Fed. R. Civ. P. 12(e). A court should only grant a motion for more definite statement when the

complaint is "so excessively vague and ambiguous to be unintelligible and as to prejudice the defendant seriously in attempting to answer it." *Phillips v. ABB Combustion Eng'g, Inc.*, No. 13-594, 2013 WL 3155224, at *2 (E.D. La. June 19, 2013) (Feldman, J.); *accord Koerner v. Vigilant Ins. Co.*, No. 16-13319, 2016 WL 4728902, at *1 (E.D. La. Sept. 12, 2016) (Africk, J.). "If the court orders a more definite statement and the order is not obeyed within 14 days after notice of the order or within the time the court sets, the court may strike the pleading or issue any other appropriate order." Fed. R. Civ. P. 12(e).

## III. LAW AND ANALYSIS

### A. *Contra Non Valentem*

Article 3492 of the Louisiana Civil Code provides that "[d]elictual actions are subject to a liberative prescription of one year." This period "commences to run from the day injury or damage is sustained." *Id.*; *see also Brown v. R.J. Reynolds Tobacco Co.*, 52 F.3d 524, 527 (5th Cir. 1995) (quoting La. Civ. Code art. 3492). "Damage is considered to have been sustained, within the meaning of the article, only when it has manifested itself with sufficient certainty to support accrual of a cause of action." *Cole v. Celotex Corp.*, 620 So. 2d 1154, 1156 (La. 1993) (citing *McCray v. N.E. Ins. Co.*, 579 So. 2d 1156 (La. App. 2 Cir. 1991)).

"[O]nce it is shown that more than a year has elapsed between the time of the tortious conduct and the filing of a tort suit, the burden shifts to the plaintiff to prove either suspension, interruption, or some exception to prescription[.]" *Terrebonne Par. Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002). "The doctrine

of *contra non valentem* was created by the Louisiana courts as an exception to the general rules of prescription." *Kling Realty Co. v. Chevron USA, Inc.*, 575 F.3d 510, 517 (5th Cir. 2009). "This doctrine suspends the prescriptive period under certain circumstances, including situations in which the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant." *Ellis*, 2022 WL 1719196, at *3 (citing *Renfroe v. State ex rel. Dept. of Transp. & Dev.*, 809 So. 2d 947, 953 (La. 2002)).

Louisiana courts have recognized four factual categories to which *contra non valentem* applies. *Marin v. Exxon Mobil Corp.*, 48 So. 3d 234, 245 (La. 2010). The fourth category of *contra non valentem*, commonly referred to as the "discovery rule," applies where "the cause of action is neither known nor reasonably knowable by the plaintiff even though plaintiff's ignorance is not induced by the defendant." *Id.*[35]

The doctrine of *contra non valentem* "creates a small opening, not a gaping hole, and so it 'only applies in exceptional circumstances.'" *Hayes v. United States*, No. 17-3841, 2018 WL 705876, at *3 (E.D. La. Feb. 5, 2018) (Africk, J.) (quoting *Renfroe v. Louisiana ex rel. Dep't of Transp. & Dev.*, 809 So. 2d 947, 953 (La. 2002)). Thus, "*contra non valentem* does not suspend prescription when a litigant is perfectly

---

[35] The first three categories of *contra non valentem*, which are not applicable in this case, arise "(1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action; (2) where there was some condition coupled with the contract or connected with the proceedings which prevented the creditor from suing or acting;" and "(3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action[.]" *Marin*, 48 So. 3d at 245.

able to bring his claim but fails or refuses to do so." *Green v. Jefferson Par. Coroner Office*, No. 05-1444, 2006 WL 380476, at *3 (E.D. La. Feb. 16, 2006) (Barbier, J.).

"Prescription commences when a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort." *Guerin v. Travelers Indem. Co.*, 296 So. 3d 625, 629 (La. App. 1 Cir. 2020) (citing *Campo v. Correa*, 828 So. 2d 502, 510 (La. 2002)). Pursuant to the discovery rule, there must be actual or constructive notice of "the tortious act, the damage caused by the tortious act, and the causal link between the act and the damage before one can be said to have 'constructive notice' of one's cause of action." *Becker v. Murphy Oil Corp.*, 70 So. 3d 885, 915 (La. App. 4 Cir. 2011) (quoting *Ducre v. Mine Safety Appliances,* 963 F.2d 757, 760 (5th Cir. 1992)).

"Constructive knowledge is whatever notice is enough to excite attention and put the injured party on guard and call for inquiry." *Campo*, 828 So. 2d at 510–11. "Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry may lead," and therefore "is sufficient to start running of prescription." *Id.* at 511 (citations omitted). "[T]he ultimate issue in determining whether a plaintiff had constructive knowledge sufficient to commence a prescriptive period is the reasonableness of the plaintiff's action or inaction in light of his education, intelligence, and the nature of the defendant's conduct." *Lennie v. Exxon Mobil Corp.*, 251 So. 3d 637, 645 (La. App. 5 Cir. 2018) (quoting *Marin*, 48 So. 3d at 246). In the context of tort actions involving latent diseases or conditions, "[t]he question is whether, in light of plaintiff's own information and the diagnoses he received, the

plaintiff was *reasonable* to delay in filing suit." *Guerin*, 296 So. 3d at 629 (citing *Cole*, 620 So. 2d at 1157) (emphasis in original).

Plaintiff was diagnosed with breast cancer in 2016.[36] The EPA released the results of the 2014 NATA in August 2018.[37] These results were not communicated to any lay persons in St. John the Baptist Parish.[38] Plaintiff did not know, among other things, that the Facility emitted EtO until she received an advertisement in the mail from the Voorhies Law Firm on or after April 28, 2020.[39] Plaintiff filed suit on April 26, 2021.[40] The first public community outreach meeting regarding the Facility's EtO emissions was held on August 21, 2021.[41] Prior to that meeting, no governmental agency, nor any of the defendants, took any steps to inform local residents that the Facility emitted EtO or that the levels of EtO emissions from the Facility increased residents' risk of developing cancer.[42]

Defendants assert that "Louisiana jurisprudence makes clear that a medical diagnosis, in and of itself, constitutes constructive notice of a cause of action."[43] Accordingly, they assert that *contra non valentem* does not apply in this case, and

---

[36] R. Doc. No. 2, at 3 ¶ 10.

[37] R. Doc. No. 1-2, at 9. It appears that the underlying data or findings contained in the 2014 NATA assessment were not publicly available until the EPA released them in 2018, although the amended complaint is not completely clear on this point. Construing the amended complaint in the light most favorable to the plaintiffs, the Court assumes this to be the case for the purpose of resolving the instant motions.

[38] R. Doc. No. 2, at 8 ¶ 41.

[39] R. Doc. No. 2, at 12 ¶ 54.

[40] R. Doc. No. 1-2, at 1.

[41] R. Doc. No. 2, at 8 ¶ ¶ 41, 42.

[42] *Id.* at 9 ¶ 42.

[43] R. Doc. No. 4-1, at 6; R. Doc. No. 17, at 4–5.

that the prescriptive period commenced upon plaintiff's 2016 diagnosis. As stated, because plaintiff filed suit in 2021, defendants assert that her claims are time-barred.

The Court notes, at the outset, that defendants misstate the doctrine insofar as they assert that a diagnosis always constitutes constructive notice. Instead, as the Louisiana First Circuit Court of Appeals recently reiterated, "[t]he question is whether, in light of *plaintiff's own information* and the *diagnoses* he received, the plaintiff was *reasonable* to delay in filing suit." *Guerin*, 296 So. 3d at 629 (citing *Cole*, 620 So. 2d at 1157) (emphasis added); *see also, e.g.*, *Butler v. Denka Performance Elastomer, L.L.C.*, 16 F.4th 427, 439 (5th Cir. 2021) ("Louisiana courts consistently consider 'the reasonableness of a plaintiff's action or inaction' based on the position she is in—including the information known or otherwise available to her at the time." (citations omitted)).

That being said, even assuming that plaintiff was unreasonable in failing to inquire further as to the cause of her cancer at the time of diagnosis, the amended complaint indicates that the Facility's harmful level of EtO emissions was not publicly known in 2016, when plaintiff was diagnosed. As stated above, constructive knowledge is "the acquisition of sufficient information, which, if pursued, *will lead to the true condition of things.*" *Lennie*, 251 So. 3d 637, 645 (quoting *Marin*, 48 So.3d at 246) (emphasis added); *see also, e.g.*, *In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 995 F.3d 384, 394 (5th Cir. 2021) (pursuant to the discovery rule, plaintiffs "are charged with knowledge of *all that a reasonable inquiry would have revealed*" (citing *Cartwright v. Chrysler Corp.*, 255 La. 597, 232 So. 2d 285, 287 (1970)) (emphasis

added)); *Guerin*, 296 So. 3d at 629 (constructive knowledge "is tantamount to knowledge or notice of *everything to which a reasonable inquiry may lead*" (emphasis added)); *Tenorio v. Exxon Mobil Corp.*, 170 So. 3d 269, 274 (La. App. 5 Cir. 2015) ("For purposes of *contra non valentem,* a plaintiff will be deemed to know what he *could have learned* with reasonable diligence." (emphasis added)). Accordingly, even if plaintiff's diagnosis triggered a duty to inquire further, the Court can only deem plaintiff to know what a reasonable inquiry would have revealed—which, according to the pleadings, is nothing with respect to the Facility's emissions.[44]

Few cases consider whether *contra non valentem* applies in cases wherein an individual fails to reasonably inquire as to the cause of her condition, but wherein such an inquiry would have been futile. The Fifth Circuit recently considered a situation in which the plaintiffs, who experienced persistent alopecia allegedly caused

---

[44] Additionally, the Court is not prepared to conclude, on the basis of the amended complaint alone, that the publication of a single report in 2018 would be sufficient to trigger constructive knowledge. *See, e.g.*, *Frank v. Shell Oil Co.*, 828 F. Supp. 2d 835, 845 (E.D. La. 2011) (Fallon, J.) (concluding that plaintiff, as a lay person outside of the medical and scientific fields, could not reasonably be expected to be aware of scientific and industry publications regarding the cancer-causing propensities of benzene); cf. *In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 995 F.3d 384, 393–94 (5th Cir. 2021) (concluding that news media coverage, online advocacy by a group of individuals who developed permanent hair loss after using the relevant chemotherapy drug, and multiple scientific studies, together, were sufficient to give rise to constructive notice).

Plaintiff has alleged that the results were not communicated to residents of St. John the Baptist Parish, whether by governmental agencies, the media, or defendants. The first alleged instance of any type of outreach to members of the public is the Voorhies Law Firm's mailed advertisements, which plaintiff received on or after April 28, 2020, and plaintiff filed the instant action less than a year after receipt of the advertisement. Of course, in subsequent stages of litigation, defendants will be free to produce evidence establishing that there was some degree of public awareness regarding the Facility's EtO emissions prior to April 2020.

by Taxotere, a chemotherapy drug, "never argued that they inquired about the cause of their persistent hair loss, only that there is a dispute as to what an inquiry would have revealed." *In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 995 F.3d 384, 393 (5th Cir. 2021). If plaintiffs' failure to reasonably inquire as to the cause of their condition was sufficient, in itself, to preclude the application of *contra non valentem*, the court's analysis need not have proceeded beyond that fact. However, the court proceeded to consider whether a reasonable inquiry would have revealed sufficient information. The court concluded that a "reasonable inquiry would have uncovered at least some information that linked Taxotere to persistent alopecia," citing news coverage and scientific studies linking Taxotere with persistent alopecia. *Id.* at 394. Because plaintiffs had not "raised a genuine dispute of material fact that a reasonable inquiry would have left them without knowledge — if not certainty — of whom to sue by 2015," the court affirmed the entry of summary judgment in favor of the defendants. *Id.* at 394. Thus, the court's analysis was necessarily premised on the proposition that, if a plaintiff shows that a reasonable inquiry would have been futile, the plaintiff can overcome the fact that her failure to inquire was unreasonable.

On the basis of the pleadings alone, the Court concludes that a reasonable inquiry—conducted at any time between 2016, when plaintiff was diagnosed, and April 2020, when the Voorhies Law Firm sent mailers about this issue to members of

the public—would not have revealed sufficient facts to put plaintiff on constructive notice of her cause of action. Accordingly, plaintiff's claims are not prescribed.[45]

## B. Negligence

Louisiana law provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." La. Civ. Code art. 2315(A). Louisiana courts conduct a duty-risk analysis to determine whether to impose liability under article 2315. *Lemann v. Essen Lane Daiquiris, Inc.*, 923 So. 2d 627, 632-33 (La. 2006). Liability requires satisfaction of five elements: (1) the defendant had a duty to conform his conduct to a specific standard; (2) the defendant's conduct failed to conform to the appropriate standard; (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries; (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries; and (5) actual damages. *Id.* at 633.

### 1. Duty

Judge Vance concluded that plaintiffs failed to specify a "specific standard" of care with which defendants should have complied, as required pursuant to Louisiana law. *Ellis*, 2022 WL 1719196, at *10 (citing *Lemann*, 923 So. 2d at 633). In reaching that conclusion, Judge Vance referred extensively to *Butler v. Denka Performance Elastomer, LLC*, 16 F.4th 427 (5th Cir. 2021), in which the Fifth Circuit considered

---

[45] Evonik also asserts that the continuing tort doctrine does not apply to suspend the commencement of prescription. R. Doc. No. 12-2, at 11. However, Judge Vance has already considered and rejected Evonik's arguments as to this point. *Ellis*, 2022 WL 1719196, at *8–9. The Court concurs with Judge Vance's analysis.

claims arising from allegedly unsafe emissions of chloroprene in the plaintiff's community. *Id.* at 432. As to whether plaintiff had adequately alleged a duty under Louisiana law, the Fifth Circuit explained:

> Butler asserts that Denka violated Louisiana's general duty "to use reasonable care to avoid injury to another." *Rando v. Anco Insulations, Inc.*, 16 So. 3d 1065, 1086 (La. 2009). She says Denka's chloroprene emissions—untethered from any particular emissions threshold—are nonetheless unreasonably excessive.
>
> . . . Butler's retreat to generalized grievances is unavailing. While Louisiana law does impose a "universal duty" on defendants in a negligence action to use "reasonable care," *Rando*, 16 So. 3d at 1086, plaintiffs are still required to assert a "specific standard" of care. *See Lemann*, 923 So. 2d at 633. The inquiry into a defendant's particular duty "is whether the plaintiff has any law (statutory, jurisprudential, or arising from general principles of fault) to support the claim that the defendant owed him a duty." *Id.*; *accord Boykin v. La. Transit Co.*, 707 So. 2d 1225, 1230 (La. 1998) (emphasizing that in a "proper duty-risk analysis" the court should first identify "the duty imposed upon the defendant by statute or rule of law"). "Whether a legal duty exists, and the extent of that duty, depends on the facts and circumstances of the case, and the relationship of the parties." *Joseph v. Dickerson*, 754 So. 2d 912, 916 (La. 2000).
>
> Here, Butler relies not on the EPA, OSHA, or other agencies' recommended emissions thresholds but on generalized pronouncements that Denka has violated its duty to take "reasonable care." *Yet, Butler points to no "statutory," "jurisprudential," or any other source of law— and we have likewise found none—in which such generalized references to "excessive emissions," "acceptable risk threshold," and "unreasonably dangerous emissions," constitutes a sufficient legal duty to support a negligence . . . claim.*

*Ellis*, 2022 WL 1719196, at *10 (quoting 16 F.4th at 443–46) (emphasis added).

Ultimately, Judge Vance concluded:

> plaintiffs have cited no cognizable source or articulation of the duty alleged. They instead rest on the notion that Evonik has a duty to exercise "ordinary care," to "avoid an unreasonable risk of harm to persons located in the surrounding areas.," and to "reduce emissions to

> a level that do[es] not pose an unreasonable risk of harm." But plaintiffs
> go no further. They fail to specify a "specific standard" of care with
> which Evonik should have complied. *See Lemann*, 923 So. 2d at 633.

*Id.* at *9–10 (footnotes omitted). Accordingly, Judge Vance dismissed plaintiffs'

negligence claim without prejudice, granting leave to amend as to that claim.

*Id.* at *11.

In her amended complaint, plaintiff alleges that defendants have a duty to

conform to the standard of care set forth in Louisiana Administrative Code, 33:III

("Environmental Regulatory Code").[46] In particular, plaintiff cites[47] L.A.C. 33:III.905,

which provides in relevant part:

> [T]o aid in controlling the overall levels of air contaminants into the
> atmosphere, air pollution control facilities should be installed whenever
> practically, economically, and technologically feasible. When facilities
> have been installed on a property, they shall be used and diligently
> maintained in proper working order whenever any emissions are being
> made which can be controlled by the facilities, even though the ambient
> air quality standards in affected areas are not exceeded.

Additionally, plaintiff cites[48] to L.A.C. 33:III.2121 ("Fugitive Emission Control") and

33:III.502 (defining fugitive emissions). Section 2121 contains monitoring, inspection,

leak detection, and leak repair requirements that apply to the Facility, which are

designed to reduce and prevent where possible fugitive emissions from the Facility

and to ensure effective and timely detection, repair, and management of leaking

equipment. Accordingly, plaintiff alleges:

> Pursuant to the [Environmental Regulatory] Code, the Defendants have
> a duty to control the overall emissions of EtO into the atmosphere

---

[46] R. Doc. No. 2, at 10 ¶¶ 47, 48.

[47] R. Doc. No. 2, at 10 ¶¶ 47, 48.

[48] *Id.* at 10 ¶ 48.

through installing and diligently maintaining emissions control systems and equipment at 'point sources' where emissions are planned to occur and through a LDAR program to control unplanned fugitive emissions. Emission controls were to be installed and diligently maintained for the purpose of protecting public health, safety, and welfare regardless of whether the emissions are within permit limits and regulatory ambient air quality standards.[49]

Plaintiff submits that *Spencer v. Valero Refining Meraux, LLC*, --- So. 3d ---, 2022 WL 305319 (La. App. 4 Cir. 2022), supports her contention that L.A.C. 33:III supplies a sufficiently specific standard of care. The plaintiff in *Spencer* alleged that defendant's negligence resulted in an explosion at a Valero refinery. *Id.* at *1. The court of appeals found that "Valero had a duty to control the overall levels of air contaminants entering the surrounding area by conforming its conduct to a specific standard of care under LAC 33.III.905(A)," and "did not conform its conduct to this standard." *Id.* at *5.

First, Shell attempts to frame the *Spencer* court's holding as being based, at least in part, on the fact that the chemical release at issue "exceeded . . . permit limits."[50] However, the court's holding makes no mention of permit limits. The opinion only references permit limits when quoting an incident report prepared by the Louisiana Department of Environmental Quality. *Id.* at *5. Presumably, if the fact of exceeding permitted levels of chemical release was a critical component to the specific standard of care, the court would have stated as much.

---

[49] *Id.*

[50] R. Doc. No. 11, at 9.

Second, Shell argues that the standard of care outlined by L.A.C. 33:III.905 is not sufficiently "specific" because it creates a "line-drawing problem . . . where the level authorized emissions somehow moves from 'reasonable' to 'unreasonable,' or safe to unsafe."[51] However, this is not the meaning of "specific" as articulated in *Lemann* and *Butler*. "Specific" does not mean that a standard must supply a specific quantitative threshold. Instead, the "specific standard" requirement means that plaintiff must cite to a specific legal authority in order to establish that defendant had a duty. In other words, "[t]he inquiry into a defendant's particular duty 'is whether the plaintiff has any law (statutory, jurisprudential, or arising from general principles of fault) to support the claim that the defendant owed him a duty.'" *Butler*, 16 F.4th at 445 (quoting *Lemann*, 923 So.2d at 633).

As the Fifth Circuit noted, there was "a dearth of Louisiana case law relating to a defendant's legal duty regarding the emission of chemicals" when *Butler* was decided. 16 F.4th at 445 n.6. Since that time, the Louisiana Fourth Circuit Court of Appeals has unequivocally held that L.A.C. 33:III.905 gives rise to a specific standard of care in this context, and the Court finds such reasoning to be persuasive. Further, plaintiff's amended allegations are "a far-cry from the *Butler* plaintiff's allegations and the allegations in the unsevered Original Plaintiffs' complaint that generally alluded to 'unreasonably excessive emissions.'" *Foster v. Evonik Corp.*, No. 22-1519,

---

[51] R. Doc. No. 11, at 10.

2022 WL 3214406 (E.D. La. Aug. 9, 2022) (Barbier, J.).[52] Accordingly, plaintiff's complaint sufficiently states a specific standard of care. *See id.*[53]

### 2. Breach

Having concluded that defendants had a duty to conform their conduct to a specific standard of care, the Court must now determine whether plaintiff has sufficiently alleged that defendants' conduct failed to conform to this standard.

Shell's arguments with respect to breach are brief. In essence, Shell argues that the amended complaint contains no allegations that "Shell failed to abide by permits or install pollution control facilities or devices when it operated the facility in the 1990s."[54] However, as stated above, the specific standard of care in this matter does not hinge on compliance with state-issued permits. Further, L.A.C. 33:III.905, which supplies the relevant standard, requires not only that the relevant entities *install* such pollution control facilities, but also that such facilities "shall be used and diligently maintained in proper working order[.]" Accordingly, Shell's arguments are unavailing.

Evonik argues that even if plaintiff has alleged a specific duty of care, plaintiff has failed to properly allege that Evonik breached that duty of care.[55] Specifically, Evonik contends that plaintiff does not identify any comments, findings, or information that support her conclusion that Evonik violated or otherwise failed to

---

[52] Westlaw page numbers are unavailable at this time. *See* Civil Action No. 22-1519, R. Doc. No. 13, at 16–17.

[53] *Id.* at 17.

[54] R. Doc. No. 4-1, at 13.

[55] R. Doc. No. 12-1, at 15.

comply with the cited regulations.[56] Evonik submits that plaintiff's amended complaint is insufficient, due to the failure to include any facts supporting plaintiff's allegations that Evonik used faulty equipment or failed to comply with a leak detection program.[57] Plaintiff responds that she alleged sufficient facts to support her allegations of breach.[58]

The amended complaint alleges that "Defendants have operated the facility without sufficient emissions and leak controls to reasonably limit and/or eliminate the toxic EtO."[59] Plaintiff claims that "fugitive leaks are caused by undetected and unrepaired leaks, faulty equipment, and other negligence."[60] Moreover, plaintiff alleges that at a community outreach meeting regarding the facility's EtO emissions organized by the EPA with LDEQ,

> the EPA explained that, based on the cancer risk the facility's EtO emissions cause to the communities around it, the EPA considers the facility's emission levels to "not be sufficiently protective of human health" despite a reported reduction in emissions from 2014 to 2020. Even though the EPA advised that Evonik has decreased its EtO emissions from 2014 to 2020 by nearly 50%, the levels emitted were still not "sufficiently protective of human health" according to EPA guidelines and standards even though within permitted limits.[61]

Plaintiff claims that the reduction in emissions from 2014 to 2020 was "mostly attributable to the facility reducing fugitive EtO emissions *i.e.*, unplanned emissions

---

[56] *Id.* at 16.

[57] *Id.* at 17.

[58] R. Doc. No. 14, at 13–14.

[59] R. Doc. No. 2, at 7 ¶ 38.

[60] *Id.* at 7 ¶ 40.

[61] *Id.* at 9 ¶ 43.

caused by leaks in equipment, faulty processes, accidents, and other negligence," and the facility was able to reduce unplanned fugitive emissions "mostly [as] the result of improvements in the facility's mandated leak detection and repair program ("LDAR")."[62] Moreover, plaintiff alleges that "the remaining reduction in EtO emissions was due to improvements to the operation of the facility's stack scrubber, which is the system and equipment used to control planned and known EtO emissions from the facility."[63] Finally, plaintiff claims that, "[a]ccording to the EPA, Evonik has plans to continue improving and 'enhancing' its LDAR program and scrubber operations to reduce further fugitive and planned EtO emissions from the facility[.]"[64] Finally, plaintiff alleges that defendants "failed to act reasonably and diligently in controlling planned EtO emissions from its scrubber – a source point – and from unplanned fugitive emissions from leaks and faulty equipment and are still taking steps to try to conform their conduct to the required standards of care to protect the public health of the Plaintiff and other residents who have lived and still live near the facility."[65]

Viewing the allegations in the light most favorable to the plaintiff, the Court concludes that her allegations are sufficient to state a claim as to breach. *See Lebouef*

---

[62] *Id.* at 9 ¶ 44.

[63] *Id.* at 10 ¶ 45.

[64] *Id.* at 10 ¶ 46.

[65] *Id.* at 11 ¶ 48.

*v. Evonik Corp.*, No. 22-1523, 2022 WL 3159920 (E.D. La. Aug. 8, 2022) (Barbier, J.) (concluding the same).[66]

Evonik seeks, in the alternative, a more definite statement requiring plaintiff to "identify the alleged 'unauthorized' or unpermitted emissions from Evonik's [Facility] that form the basis of Plaintiff's lawsuit."[67] Evonik submits that plaintiff's amended complaint "is so vague and ambiguous that Evonik is not able to determine what unauthorized or unpermitted releases of EtO – other than two such releases in 2012 and 2013 that cannot alone form the basis of any continuing tort – make up the basis for Plaintiff's claims such that Evonik is unable to defend against the same."[68]

As stated above, a court should only grant a motion for more definite statement when the complaint is "so excessively vague and ambiguous to be unintelligible and as to prejudice the defendant seriously in attempting to answer it." *Phillip*, 2013 WL 3155224, at *2. Such is not the case here. The Court will deny the Rule 12(e) motion.

## C. Nuisance

Judge Vance previously concluded that the original plaintiffs properly stated a claim for nuisance in their original complaint, and that an amendment was unnecessary. Evonik once again argues that plaintiffs' nuisance allegations are too vague and thus fail to adequately support the negligence element incorporated into the claim.[69] In addressing this argument, Judge Vance concluded that it

---

[66] Civil Action No. 22-1523, R. Doc. No. 14, at 17.

[67] R. Doc. No. 12-1, at 18.

[68] *Id.*

[69] R. Doc. No. 12-1, at 18–20.

conflates the general negligence standard under article 2315 with the
distinct negligence requirement for a nuisance claim under Louisiana's
vicinage articles, which deal specifically with a proprietor's relationship
to his neighbors . . . [and] unlike their article 2315 general-negligence
claims, plaintiffs' nuisance claims do not require an allegation of a
separate source of duty.

*Ellis*, 2022 WL 1719196, at *13. The Court concurs with Judge Vance's reasoning,

and it concludes that plaintiffs have stated a claim for nuisance. *See also Foster*,

2022 WL 3214406 (concluding the same).[70]

## IV. CONCLUSION

For the reasons stated herein,

**IT IS ORDERED** that Evonik's motion to dismiss is **DENIED**.

**IT IS FURTHER ORDERED** that Shell's motion to dismiss or,

alternatively, Rule 12(e) motion for a more definite statement is **DENIED**.

New Orleans, Louisiana, August 10, 2022.

LANCE M. AFRICK
**UNITED STATES DISTRICT JUDGE**

---

[70] Civil Action No. 22-1519, R. Doc. No. 13, at 19.